Benjamin F. Haas and Addie R. Haas v. Commissioner.
Haas v. Commissioner
Docket No. 56640.
United States Tax Court
T.C. Memo 1959-86; 1959 Tax Ct. Memo LEXIS 159; 18 T.C.M. (CCH) 401; T.C.M. (RIA) 59086; April 30, 1959
*159 Theodore Tannenwald, Jr., Esq., for the petitioners. Ellyne E. Strickland, Esq., and Emil Sebetic, Esq., for the respondent. KERN Supplemental Memorandum Findings of Fact and Opinion KERN, Judge: This case is before us on remand from the Court of Appeals for the Second Circuit for further proceedings in accordance with the views expressed by the Court of Appeals in an opinion accompanying the mandate and reported in 248 F. 2d 487. Our Memorandum Findings of Fact and Opinion considered on appeal was filed herein on July 16, 1956. On December 4, 1957, this case was placed on our motions calendar "for further proceedings under mandate" before the late Judge Stephen E. Rice of this Court to whom this case was at that time assigned. At that hearing the parties hereto agreed that no further record was necessary, and the dates were fixed for the filing of briefs. The Court of Appeals in its opinion assumed that our conclusion that the profit and loss arrangements were not bona fide meant that we had "adjudged that Mr. and Mrs. Haas did not, in fact, pay the losses of Oxford that they sought to deduct on their income tax returns as having been paid by *160 them, or if actually paid, that these payments were secretly repaid, or that the losses were otherwise covertly recouped," and on this assumption held that this conclusion was not a justifiable one. The Court of Appeals also held that our statement, to the effect that the taxpayers' attempt to claim the corporation losses as their own was a plan for improper tax avoidance, was irrelevant to the issues before us. As to these matters we are capable of understanding the opinion of the Court of Appeals without difficulty. However, a problem of exegesis, which has been somewhat troublesome to us, is presented by that part of the Court's opinion which we quote as follows: "For the reasons stated in Judge Medina's opinion in Gilbert v. Commissioner, 2 Cir., 248 Fed. (2d) 399, we hold that determination of whether the profit and loss arrangements were effective to minimize the petitioners' taxes depends upon whether those agreements effected any economic consequences in the business conducted by Oxford, and does not depend upon the results of an inquiry into the motives of the petitioners. "Determination of whether petitioners can claim as a deduction the losses sustained *161 between 1948 and 1950 depends upon whether the agreements of 1948 and 1949 created a 'joint venture' between Oxford and them. A 'joint venture' is, for tax purposes, equivalent to a partnership. Section 3797(a)(2), Internal Revenue Code of 1939, 26 U.S.C. § 3797(a)(2). A family partnership is recognized for tax purposes if 'the partners joined together in good faith to conduct a business * * *.' Commissioner of Internal Revenue v. Culbertson, 1949, 337 U.S. 733, at pages 744-745, 69 S. Ct. 1210, at page 1215, 93 L. Ed. 1659. In Culbertson, as in the present case, the existence of the business antedated the formation of the partnership. But in that case there was no doubt that a change had occurred in the conduct of the business. The control of the enterprise had changed hands. That fact distinguishes Culbertson from this case, for here the control of the enterprise did not change hands. For many years, petitioners made substantial advances to Oxford. Mr. Haas always controlled the policies of Oxford and devoted his time and effort to its management. The agreements entered into in 1948 and 1949 may have indeed created rights and duties between the *162 parties to those agreements; and also may have created rights and duties between the contracting parties, on the one hand, and third persons dealing with the contracting parties on the other. Nevertheless these agreements in no way affected the control of Oxford or the operation of the business carried on by Oxford. "The situation here is akin to that in Gregory v. Helvering, 1935, 293 U.S. 465, 55 S. Ct. 266, in which, although the newly created corporation undoubtedly existed, the Supreme Court held that the corporate entity must be disregarded for tax purposes because it did not serve 'a business purpose' and was, therefore, outside the intent of the statute. The interpretation which this court gave to Gregory in Kraft Foods Co. v. Commissioner, 1956, 232 Fed. (2d) 118, 128, is of particular significance. '[It] [holds] that transactions, even though real, may be disregarded * * * if they take place between taxable entities which have no real existence.' We follow that interpretation here. [1]
*163 "Prior to 1948 the losses sustained were admittedly the losses of the corporation. Since the creation of the joint venture did not change the functioning of Oxford Mills, the control of its operations, or affect its ownership, the Tax Court will have to determine on remand whether the change in legal relations effected by the profit and loss agreements of 1948 and 1949 was a sufficient basis upon which to shift the losses from Oxford to the petitioners. "We remand the cause to the Tax Court for further proceedings there in accordance with the views expressed in this opinion." We understand the Court of Appeals to mean by that part of its opinion above quoted that although a joint venture was created between petitioners and Oxford, it may properly be disregarded for tax purposes as having no economic reality if it does not serve a business purpose; that the following factors exist in this case which indicate a lack of economic reality with regard to the joint venture: (1) It did not change the functioning of Oxford, (2) it did not change the control of Oxford, and (3) it did not affect the ownership of Oxford; but that the case should again be considered by the Tax Court for the *164 purpose of determining whether the profit and loss agreements of 1948 and 1949 effected any other change in legal relations which would be "a sufficient basis upon which to shift the losses from Oxford to the petitioners." In addition to the facts set out in our Memorandum Findings of Fact and Opinion filed July 16, 1956, we find as follows: At all times since the incorporation of Oxford, Benjamin's daughter, to whom he had given all of its common stock, deferred in all matters to the judgment of Benjamin even though she was at times in disagreement with it and acquiesced in his complete control of Oxford's operation and management. Benjamin's decisions to advance money and credit to Oxford and cause his wife to advance money to Oxford and his decisions to cause the executions of the agreements of January 12, 1948, and January 3, 1949, between him and Oxford were made on his own volition and initiative, and were not suggested or requested by any other person. No outside investor or entrepreneur would have entered into such agreements and advanced working capital pursuant thereto. The meetings of Oxford's board of directors, at which Oxford's executions of those agreements were *165 authorized, were held in Benjamin's office and were attended by Benjamin and William Gegenheimer who had been an employee of Benjamin since 1919 and who deferred in all business matters to Benjamin. The motions calling for the executions of those agreements by Oxford were made by Benjamin and seconded by Gegenheimer. During the taxable years Benjamin recognized and dealt with Oxford as a separate entity, even though it was one over which as a practical matter he had absolute control. He had no intention during these years of disregarding the corporate form of Oxford and taking over its business for the purpose of eventually making a personal profit from its operation. Any intention on his part as to "taking over" referred to the responsibility of advancing funds to Oxford for its use as working capital, a responsibility which he had felt from the time of Oxford's incorporation. Benjamin originally made and caused his wife to make the advances of working capital to Oxford for the purpose of creating or adding to the value of the common stock of Oxford which he had given to his daughter. During the period Oxford's plant was leased substantial repayments of such advances were made *166 by Oxford. At the expiration of the lease Benjamin decided that Oxford should again go into the business of manufacturing and selling textiles. At that time he understood that he would again have to advance funds to Oxford for working capital. He was of the opinion, which he frequently expressed to his wife and daughter, that the operation of Oxford would be profitable, although he was enough of a realist to anticipate that it would sustain operating losses during an indeterminate period following the expiration of the lease in 1947 while it was developing its own manufacturing and sales. Benjamin had made large sums of money in the textile industry and was self-satisfied and self-confident with regard to his business judgment. Because of his optimism and egotism Benjamin made advances to Oxford during the taxable years (over the remonstrances of his wife and daughter) for the purpose of demonstrating his confidence in his own business judgment, for the purpose of safeguarding the investments of his wife in Oxford which he had caused her to make, for the purpose of maintaining and adding to the value of the common stock of Oxford which he had given to his daughter, and, to a minor *167 extent, for the purpose of making collectible the advances which he had already made. He had no intention or purpose to realize himself any profit which he optimistically hoped that Oxford might make. Benjamin cast the transactions pursuant to which the advances were made in the taxable years in the form of the joint ventures provided by the agreements of January 12, 1948, and January 3, 1949, for the purpose of permitting him to currently take deductions from his own gross income on account of those parts of his advances to Oxford equivalent to the operating losses of Oxford anticipated by him during the time Oxford was developing its own manufacturing and sales after the termination of the lease in 1947. We find as ultimate facts: 1. The change in legal relations, if any, effected by the profit and loss agreements of 1948 and 1949 was not a sufficient basis upon which to shift the losses from Oxford to the petitioners. 2. The form which Benjamin chose for the transactions, pursuant to which the deductions are claimed, was not intended to and did not appreciably or in any practical or real sense affect any beneficial interest that petitioners had in the venture. Accepting *168 the law of this case to be as stated by the Court of Appeals (248 Fed. (2d) 487), and upon the findings heretofore and herein made by us. [1]
Decision will be entered for the respondent. Footnotes
1. "See also Kocin v. United States, 2 Cir., 1951, 187 Fed. (2d) 707, where the Commissioner disallowed a business expense deduction claimed by the taxpayer corporation for commissions paid to a partnership composed of stockholders, officers and employees of the taxpayer. The partnership was organized to take over the selling function previously performed by the taxpayer. We sustained the Commissioner's determination, relying on Gregory v. Helvering, because 'the partnership served no business purpose.' 187 Fed. (2d) 707, 708↩."
1. These findings distinguish this case from Wiggin v. Commissioner, 46 Fed. (2d) 743, reversing 19 B.T.A. 282, and C. A. Ripley, 26 T.C. 1203↩, relied upon by petitioners.